## O'Neill v. McKeesport Hospital

*Neil R. Rosen*, for plaintiff.

*Linton L. Moyer*, for defendant McKeesport Hospital.

WETTICK, *A. J.*, January 30, 1987 — This is a medical malpractice action arising out of the death of Scott Charles O'Neill during a July 7, 1983 hospitalization at McKeesport Hospital. His death was caused by a cardiac arrest resulting from a reaction to the anesthesia that had been administered. Plaintiff's complaint alleges that McKeesport Hospital's negligence includes its failure to adopt rules, regulations, and procedures for safe administration of anesthesia, its failure to require hospital employees to monitor a patient's body temperature during surgery, its failure to comply with policies established by the Joint Commission on Accreditation of Hospitals, and its failure to recognize and diagnose Scott O'Neill's condition.

Plaintiff has requested McKeesport Hospital to produce documents, reports, or recommendations prepared or issued by the Joint Commission on Accreditation of Hospitals dealing with the areas of anesthesia and surgery of McKeesport Hospital. McKeesport Hospital objects to this request on the ground that the information which plaintiff seeks is protected by the Peer Review Protection Act (Act of July 20, 1974, P.L. 564, 63 P.S. §425.1 et seq.).

Section 4 of this act (63 P.S. §425.4) protects the following records from discovery:

"The proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action against a professional health care provider arising out of the matters which are the subject of evaluation and review by such committee and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such committee or as to any findings, recommendations, evaluations, opinions or other actions of such committee or any members thereof: Provided, however, that information, documents or records otherwise available from original sources are not to be construed as immune from discovery or use in any such civil action merely because they were presented during proceedings of such committee, nor should any person who testifies before such committee or who is a member of such committee be prevented from testifying as to matters within his knowledge, but the said witness cannot be asked about his testimony before such a committee or opinions formed by him as a result of said committee hearings."

## I

Section 4 of the Peer Review Protection Act protects only proceedings and records of a *review committee*. Thus, initially, we must determine whether JCAH records are records of a review committee. The Peer Review Protection Act defines review committee to include "any committee engaging in peer review" (63 P.S. §425.2). The act defines peer review as "the procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other professional health care providers, including practice analysis . . . and the compliance of a hospital with the standards set by an association of health care providers and with applicable laws, rules, and regulations." (63 P.S. §425.2).

According to the JCAH Accreditation Manual for Hospitals, 1983 Edition, the JCAH was created in 1951 by the American College of Surgeons, the American College of Physicians, the American Hospital Association, the American Medical Association, and the Canadian Medical Association. The purposes of the JCAH, as set forth in its certificate of incorporation, are:

"(1) [T]o establish standards for the operation of hospitals and other health-related facilities and services;

"(2) [T]o conduct survey and accreditation programs that will encourage members of the health professions, hospitals, and other health-related facilities and services voluntarily:

"(a) to promote high quality of care in all aspects in order to give patients the optimum benefits that medical science has to offer,

"(b) to apply certain basic principles of physical plant safety and maintenance, and of organization

and administration of function for efficient care of the patient, and

"(c) to maintain the essential services in the facilities through coordinated effort of the organized staffs and the governing bodies of the facilities; [and]

"(3) [T]o recognize compliance with standards by issuance of certificates of accreditation." *Id.* at ix.

JCAH summarizes its role as follows:

"JCAH assumes the role of *evaluator*, consultant and educator. Its function is to help hospitals identify both their strengths and weaknesses in regard to JCAH standards, and to provide guidelines for improvement through consultation and education. A request by a hospital for a survey signifies a professionally motivated, voluntary commitment to self-evaluation and self-improvement." *Id.* at xii. (emphasis supplied)

The review of the operations of the McKeesport Hospital conducted by health care providers on behalf of JCAH is the work product of a committee of professional health care providers evaluating the quality and efficiency of the services of another health care provider, including the compliance of the health care provider with the standards set by an association of health care providers. Consequently, records of such a review are records of a review committee for purposes of section 4 of the Peer Review Protection Act. See *Fretz v. Keltner,* 109 F.R.D. 303, 311 (U.S. Dist. Ct., Kan., 1985); *Niven v. Siqueira,* 487 N.E.2d 937, 940-2 (Illinois Supreme Court, 1985); *Tucson Medical Center Inc. v. Misevch,* 545 P.2d 958, 962 (Arizona Supreme Court, 1976).

Before reaching this conclusion, we considered the case law cited by plaintiff. In the case of *Patients of Philadelphia State Hospital v. Common-*

*wealth of Pennsylvania,* 53 Pa. Commw. 126, 417 A.2d 805 (1980), the court compelled the department of public welfare to produce a JCAH evaluation of a state hospital to its patients. However, this case dealt with an entirely different issue—whether a JCAH evaluation of a state hospital was a public record within the meaning of the Right to Know Act (Act of June 21, 1957, P.L. 390, as amended, 65 P.S. §61.1 et seq.). The Right to Know Act does not incorporate the provisions of the Peer Review Protection Act, and the court never discussed the Peer Review Protection Act, but, instead, based its decision solely on the language of the Right to Know Act. Consequently, the conclusion that the Right to Know Act makes available to the public a JCAH evaluation of a state hospital has no relevance to the issue of the right of a private hospital to protect a JCAH evaluation of its operations from disclosure.

Plaintiff also cites *Fowler v. Pirris,* 34 D.&C.3d 530 (1981), which required a hospital to produce JCAH accreditation reports. The court based its ruling on a provision of the Peer Review Protection Act which permits disclosure of documents considered by a review committee if they are obtainable from the original source. The court said that this discovery would be permitted because it has no reason to believe that the documents were unavailable from the original source (i.e., JCAH).

We do not find this reasoning to be persuasive. The provision of section 4 upon which the *Fowler* court relied states that records "otherwise available from original sources are not be construed as immune from discovery . . . merely because they were presented during proceedings of such committee." This provision merely provides that a committee's review of documents that could be obtained through discovery does not immunize these documents from

discovery. If the records of a JCAH evaluation are records of a review committee, they are protected by the Peer Review Protection Act and, thus, are not subject to a discovery request directed to the JCAH.

Finally, plaintiff argues that McKeesport Hospital may not rely on the Peer Review Protection Act because the act does not protect from discovery the JCAH standards for providers of health services or documents maintained by hospital personnel showing compliance with these standards. However, in this opinion, we do not consider whether plaintiff would be entitled to this information because it is not covered in plaintiff's request for production of documents. The JCAH standards governing health care providers are not covered because plaintiff's discovery request seeks only documents, reports, or recommendations dealing with the areas of anesthesia and surgery of defendant hospital. The hospital's self-assessment is not covered because the request seeks only documents, reports, or recommendations prepared by or issued by JCAH.

In summary, this opinion holds only that any findings, recommendations, evaluation, or opinions of JCAH, generated by health care providers on behalf of JCAH, with respect to any review of the practices and procedures governing treatment involving anesthesia or surgery within McKeesport Hospital are records of a review committee within the meaning of section 4 of the Peer Review Protection Act.

## II

We next consider the restrictive language of section 4 of the Peer Review Protection Act that protects the proceedings and records of a review committee from discovery only "in any civil action against a professional health care provider arising

out of the matters which are the subject of evaluation and review by such committee." It is plaintiff's contention that it is entitled to all JCAH records that did not directly address the July 7, 1983 death of Scott O'Neill because this is the only matter out of which this civil action arises. McKeesport Hospital, on the other hand, contends that this civil action arises out of the anesthesia and surgery procedures of the McKeesport Hospital and, consequently, all JCAH records which plaintiff requests are protected.

Neither contention is inconsistent with the language of section 4. No Pennsylvania appellate courts have construed this language limiting the protections of section 4 to civil actions arising out of matters which are the subject of the committee's evaluation and review. Consequently, this court will construe this language in the manner that is most consistent with the goals and objectives of the Peer Review Protection Act. We conclude that the goals and objectives of the act mandate that section 4 be construed, at the very minimum, to protect from discovery any peer review of a medical care provider in any lawsuit against that provider.

The purpose of peer review is to improve the quality of care provided by health care providers through reviews by other health care providers of care and treatment previously rendered. 63 P.S. §425.2. Effective peer review requires the reviewing physicians to make a comprehensive and honest evaluation. Such an evaluation may contain findings and recommendations that are extremely critical of another health care provider. If these evaluations may be used against that health care provider in medical malpractice actions, it is far less likely (1) that physicians or hospitals will seek peer review or (2) that physicians engaging in peer review will make a

comprehensive and honest evaluation when the evaluation would be critical of another health care provider. Thus, the legislature has chosen to protect the findings, recommendations, evaluations, or opinions generated through peer review in order to encourage peer review. See generally, *Steel v. Weisberg*, 347 Pa. Super. 106, 500 A.2d 428 (1985); *Schwartz v. Tri-County Hospital*, 74 D.&C.2d 52, 54 (1975).

The need for protecting peer review was recognized in the early and frequently cited case of *Bredice v. Doctors Hospital Inc.*, 50 F.R.D. 249 (U.S. Dist. Ct., District of Columbia, 1970), aff'd. without opinion 479 F.2d 920 (U.S. App. D.C., 1973):

"Confidentiality is essential to effective functioning of the staff meetings; and these meetings are essential to the continued improvement in the care and treatment of patients. Candid and conscientious evaluation of clinical practices is a sine qua non of adequate hospital care. To subject these discussions and deliberations to the discovery process, without a showing of exceptional necessity, would result in terminating such deliberations. Constructive professional criticism cannot occur in an atmosphere of apprehension that one doctor's suggestion will be used as a denunciation of a colleague's conduct in a malpractice suit.

"The purpose of these staff meetings is the improvement, through self-analysis, of the efficiency of medical procedures and techniques. They are not a part of current patient care but are in the nature of a retrospective review of the effectiveness of certain medical procedures. The value of these discussions and reviews in the education of the doctors who participate, and the medical students who sit in, is undeniable. This value would be destroyed if the meet-

ings and the names of those participating were to be opened to the discovery process." *Id.* at 250

Because health providers' regular use of peer review is of recent vintage, few jurisdictions had legislation protecting peer review when *Bredice v. Doctors Hospital Inc.,* was decided. However, 45 states had enacted legislation providing some protection to peer review as of 1985. Note *The Missouri Rule: Hospital Peer Review is Discoverable in Medical Malpractice Cases,* 50 Missouri Law Review 459, fn. 112 (1985). Generally, this legislation has been broadly construed because of the policy considerations for protecting peer review set forth in the *Bredice v. Doctors Hospital Inc.,* opinion. *The Missouri Rule, supra,* at fn. 65; *Franco v. District Court,* 641 P.2d 922 (Supreme Court of Colorado, 1982) and cases cited at fn. 10; *Mennes v. South Chicago Community Hospital,* 427 N.E.2d 952 (Ill. Appellate Court, 1981); *Mt. Dialo Hospital Dist. v. Superior Court,* 227 Cal. Reporter 790 (Court of Appeals, 1986); and *Petition of Attorney General v. Bruce,* 369 N.W.2d 826 (Michigan Supreme Court, 1985). These same policy considerations have even served as the basis for several court rulings that have protected peer review from discovery through a judicially created privilege (the privilege of self-critical analysis) where there was no legislation protecting peer review. See *Bredice v. Doctors Hospital Inc., supra; Tucson Medical Center Inc. v. Misevch, supra; Wylie v. Mills,* 478 A.2d 1273 (New Jersey Superior Court, 1984); *Dade County Medical Association v. Hlis,* 372 So.2d 117 (Florida Court of Appeals, 3d District, 1979), and cases cited therein; but see, *Wesley Medical Center v. Clark,* 669 P.2d 209 (Kansas Supreme Court, 1983), and cases cited therein; *State ex rel. Chandra v. Sprinkle,* 678 S.W.2d 804 (Missouri Supreme Court, 1984); and

*Hutchinson v. Smith Laboratories Inc.*, 392 N.W.2d 139 (Iowa Supreme Court, 1986).

We recognize that ordinarily legislation protecting evidence from discovery and use at trial will be narrowly construed because of the benefits that flow from the disclosure of information. But, as several courts have observed, when the benefits and injuries that will arise from disclosure of peer review proceedings are balanced, the injuries far overweigh the benefits. See, e.g., *Petition of Attorney General v. Bruce, supra.* As this court previously discussed, the public has a strong interest in peer review because it fosters critical self-evaluation within the medical profession which leads to improvements in the delivery of health care services. Effective peer review will not occur if proceedings are not confidential because professional groups have been unwilling to expose the shortcomings of members of their profession to the general public. See, e.g, Ramage-White, *The Lawyer's Duty to Report Professional Misconduct,* 20 Arizona Law Review 510 (1978).

On the other hand, the protection of peer review proceedings from discovery will not significantly impede the ability of a plaintiff to present his or her case. The peer review privilege does not include any evaluation that is related to the on-going treatment — peer review is protected only when a peer review committee functions retrospectively through an evaluation of treatment that has already been completed. See *Monty v. Warren Hospital Corp.,* 366 N.W.2d 198, 202 (Michigan Supreme Court, 1985); *Baldwin v. McGrath,* 8 D.&C.3d 341 (1978). Also, only the findings and conclusions of the peer review committee are protected. Any documents and records of the treatment which the peer review

committee reviewed continue to be subject to discovery.

A peer review committee obtains the facts on which to render opinions only by reviewing existing records and possibly talking to persons who provided or observed the medical treatment. The same documents and witnesses are available to plaintiff's counsel. The peer review privilege does not in any way interfere with the ability of plaintiff's counsel to obtain the same information that was made available to the peer review committee. See *Obenski v. Brooks,* 7 D.&C.3d 253, 263-264 (1978). This privilege — unlike other privileges which bar the discovery of factual information — only precludes plaintiff's counsel from basing his or her case on the opinions of the committee members. Section 4 of the Peer Review Protection Act protects only the facts known or opinions held by an expert who was retained to conduct a retrospective review of medical care and treatment previously provided. Through the civil rules of procedure protecting expert opinions from discovery (Pa.R.C.P. 4003.5(a)(3)), the Pennsylvania Supreme Court has already determined that a plaintiff is not unduly disadvantaged by being unable to discover the observations and conclusions of expert witnesses of defendant who became involved in the subject matter of the litigation subsequent to the events that form the basis of the lawsuit.

If we adopted plaintiff's position that section 4 protects only peer review of the treatment provided to the patient on whose behalf the case has been brought, some of the most important peer review activities would be subject to discovery. Examples include the review of the general manner in which a physician or hospital treats various types of medical conditions, the general procedures utilized in treat-

ing patients, evaluations of the overall performance of a physician, and peer review of all other cases involving similar medical treatment. The construction of section 4 which plaintiff proposes would not only discourage hospitals and physicians from seeking peer review of their overall operations and general employee performance, but would even hinder peer review in individual cases because of the possibility that this information could be used against the hospital or a physician in a different case involving similar treatment. Thus, such a broad interpretation of the restrictive language of section 4 would undermine the legislative purpose for creating the peer review privilege.

This court is aware that plaintiff's interpretation of the restrictive language of section 4 was adopted by the common pleas court of Dauphin County in *Bolton v. Holy Spirit Hospital — Kipp v. Fitzgerald,* 105 Dauphin 40 (1984). The bases for that construction were (1) that some meaning must be given to the language of section 4 that limits the privilege to those peer review matters which are the subject of evaluation and review and (2) that there is a strong public policy within Pennsylvania favoring discovery that should be reflected in construing the restrictive language of section 4. However, the present opinion's construction of restrictive language of section 4 does not render it meaningless because there are suits against a provider of health care in which the records of a peer review proceeding would not be protected because of this language. For example, the restrictive language of section 4 would permit the discovery of the peer review records of treatment provided by hospital personnel in the emergency room in a medical malpractice against a doctor who became involved in the case after plaintiff patient's release from the hospital.

Also, as we previously discussed, the policy favoring discovery applies to factual evidence. The Pennsylvania Rules of Civil Procedure governing discovery restrict the discovery of opinions of experts based on factual information that is available to an opposing party.

Finally, while most of the case law of other jurisdictions dealing with peer review is not directly on point because the legislation of other jurisdictions that protect peer review does not usually include the restrictive language of section 4, appellate courts in North Carolina and Florida have construed legislation that included similar restrictive language in a manner consistent with this court's opinion.

In *Shelton v. Morehead Memorial Hospital*, 347 S.E.2d 824 (North Carolina Supreme Court, 1986), plaintiffs sought to discover peer review records concerning the qualifications and competence of the doctors who treated the plaintiff wife. Defendant hospital objected, citing North Carolina legislation that protected the records of a peer review committee in any civil action "which results from matters which are the subject of evaluation and review of the committee." Plaintiffs, citing this restrictive language, contended that North Carolina's peer review legislation did not protect the peer review records which they sought because they did not involve a review of plaintiff wife's treatment. The court rejected this contention, stating:

"It would severely undercut the purpose of section 95, i.e., the promotion of candor and frank exchange in peer review proceedings, if we adopted plaintiffs' construction of the statute, for it would mean these proceedings were no longer protected whenever a claim of corporate negligence was made alone or coupled with a claim of negligence against an individual physician.

"Neither do we think the language of the statute, considered in context, permits the construction plaintiffs urge. Subsection (a) of section 95 constitutes a broad grant of immunity from liability for damages "in *any* civil action on account of *any* act, statement or proceeding undertaken, made or performed within the scope of the functions of the committee." (emphasis supplied) Subsection (b) of section 95 protects documents and related information against discovery or introduction in to evidence "in *any* civil action against a hospital . . . which results from matters which are the subject of evaluation and review by the committee." (emphasis supplied) A civil action against a hospital grounded on the alleged negligent performance of the hospital's medical review committees is by the statute's plain language a civil action resulting from matters evaluated and reviewed by such committees." *Id.* at 828-829. (footnote omitted)

In *Segal v. Roberts,* 380 So.2d 1049 (Florida Dist. Court of Appeals, 4th District, 1979), cert. den. 388 So.2d 1117 (1980), a patient whose medical malpractice action was based on a surgical operation performed at one hospital sought the records and evaluations of defendant doctor made by review committees at a second hospital at which this defendant also had operating privileges. The court held that Florida legislation (which restricted the discovery of peer review records to civil actions "arising out of matters which are the subject of evaluation and review") did not protect the peer review records which plaintiff sought because the restrictive language protected only peer review records "where the circumstances giving rise to the suit were the very ones considered in the committee evaluation." *Id.* at 1052. Nevertheless, the court held that the records were not discoverable as a

matter of public policy, because the "arguments in favor of confidentiality of the records and proceedings of a medical review committee are so compelling that discovery should be allowed only in the most necessitous circumstances." *Id.* Consequently, while the rationale of this case supports plaintiff's interpretation of section 4, the court's result is consistent with the result which we reach in this case.*

Also see *Franco v. District Court, supra,* where the Colorado Supreme Court construed peer review legislation protecting records "in any civil suit against the physician" to extend to a physician's action for damages and injunctive relief against a hospital which had suspended the surgical privileges of this physician. The court supported this construction by citing a prior opinion which had extended the protection of the legislation to a malpractice action against a hospital:

"Our construction comports with the broad interpretation of the statutory privilege adopted by this court in *Posey v. District Court,* 196 Colo. 396, 586 P.2d 36 (1978). There, in a malpractice action against a physician and a hospital, we upheld the quashing of deposition subpoenas served on members of an ad hoc committee appointed by the hospital's medical advisory board. We noted that the peer review statute contemplates wide-open inquiry by a review committee and a narrow construction of the privilege would frustrate this salutary goal:

" 'The precision of the statutory reference to suits against a physician is said to evince a legislative intent to deny protection to records subpoenaed in a

---

*This opinion has been followed by other Florida appellate courts. See *HCA of Florida, Inc. v. Cooper,* 475 So.2d 719 (1st District, 1985).

suit against a hospital for its allegedly negligent supervision and retention of the defendant doctor. We believe that such a narrow reading of the statutory privilege would eviscerate the legislative scheme envisioned by section 12-43.5-101, et seq. . . .

" ' "We will not construe a statute in such a way as to defeat the legislative intent . . . . In statutory construction, legislative intent is the polestar." *People v. Lee,* 180 Colo. 376, 506 P.2d 136, 139 (1973). See also section 2-4-212, C.R.S. 1973. Although the wording of section 12-43.5-102 is infelicitous, we do not think that it strains canons of judicial construction to construe section 12-43.5-102 to mean that "the records of a review committee shall not be subject to subpoena in any civil suit," including a suit against a hospital."

. . .

" 'We are faced with an intent imperfectly expressed by the legislature. In order to give effect to that intent and to prevent the statutory scheme for hospital review committees from being emasculated, we construe section 12-43.5-102(3)(e) to preclude discovery of the records of those committees in any civil action . . . . The legislative intent was that the records of the review committee would be privileged, so that the committee could freely, openly, and with unfettered discretion exercise its collective professional judgment.' 196 Colo. at 398-99, 586 P.2d at 37-38." (footnote omitted) 641 P.2d at pp. 929-930.

For these reasons, we enter the following

## ORDER OF COURT

On this January 30, 1987, it is hereby ordered that plaintiff's motion to compel production of documents is denied.